UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

SESAME WORKSHOP,                :   Case No.: 18-CV-04597 (VSB)
                        :

                 Plaintiff,     :   **ECF Case**
                        :

        -against-              :
                        :

STX PRODUCTIONS, LLC; STX     :
FINANCING, LLC and STX FILMWORKS, INC.   :
                        :

              Defendants.    :
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S APPLICATION
## FOR TEMPORARY RESTRAINING ORDER
## <u>AND PRELIMINARY INJUNCTION</u>


KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Phone: (212) 940-8800

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ........................................................................................................... 1

PRELIMINARY STATEMENT ....................................................................................... 3

FACTUAL BACKGROUND ............................................................................................ 6

ARGUMENT ................................................................................................................... 9

    I.     Plaintiff Has Not Demonstrated Personal Jurisdiction In This Court
         Because There Is No Showing That STX Purposely Availed Itself
         of the Privilege of Conducting Activities In New York State,
         Thereby Invoking The Benefits And Protections of New York Law ..................... 9

         A.     The Court Lacks General Personal Jurisdiction ........................................ 11

         B.     The Court Lacks Specific Personal Jurisdiction ...................................... 12
                  1.   Plaintiff Has Not Demonstrated Compliance With the
                       New York Long-Arm Statute ................................................. 12
                  2.   Plaintiff Has Not Demonstrated Compliance With
                       Constitutional Due Process Requirements ......................... 15

    II.    The Application Must Be Denied Because Plaintiff Has Failed To
         Satisfy Any Of The Evidentiary and Legal Requirements For
         Injunctive Relief ................................................................................................ 16

         A.     Overview Of TRO And Preliminary Injunction Standards ....................... 16

         B.     Plaintiff Cannot Demonstrate A Likelihood Of Prevailing
               On Its Trademark Claims Because STX Did Not Use The
               "SESAME STREET" Mark At All, Much Less Make A
               "Trademark Use" Of That Mark ............................................................. 16

         C.     Plaintiff Cannot Demonstrate A Likelihood Of Prevailing
               On Its Trademark Claims Because Any Use Of Its Mark Was
               Permissible As Either A Descriptive Or Nominative Fair Use
               ........................................................................................................... 18
                  1.   Descriptive Fair Use ............................................................. 18
                  2.   Nominative Fair Use ............................................................. 19

         D.     Plaintiff Cannot Demonstrate A Likelihood of Consumer
               Confusion Resulting Specifically from STX's Use Of The
               Tagline. ................................................................................................. 20
                  1.   Similarity Between Marks ...................................................... 20

          2.    Proximity of Products in Marketplace.................................................21

          3.    Actual Confusion...............................................................................21

          4.    Bad Faith ...........................................................................................23

          5.    Quality of STX's Product and Consumer Sophistication...................24

      E.      Plaintiff Cannot Demonstrate That Its Mark Has Been Diluted, Tarnished Or Blurred In Any Way Specifically By STX's Use Of The Tagline. .......................................................................24

      F.      Plaintiff Cannot Demonstrate That It Has Sustained Any Injury Whatsoever, Much Less Irreparable And Incalculable Injury, As A Result Of STX's Use Of The Tagline..................................26

      G.      Plaintiff Also Has Failed To Demonstrate Either That There Are Serious Questions Going To The Merits Of Its Claims Or That The Balance Of Hardships Tips Decidedly In Its Favor ....................................................................................................26

III.    STX Will Incur Substantial Costs And Damage If It Is Required To Remove The Tagline From Its Promotional Materials For The Film...................27

IV.    If The Court Believes That Injunctive Relief Is Warranted, It Should Condition Such Relief On Plaintiff's Posting Of A Substantial Bond, Sufficient To Cover STX's Demonstrated Costs And Damage...........................30

CONCLUSION................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Abdul Wali v. Coughlin*,
    754 F.2d 1015 (2d Cir. 1985)............................................................................3, 16

*Alibaba Group Holding Limited v. Alibabacoin Foundation*,
    18-CV-2897 (JPO), 2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018)........................11

*Ariel Investments, LLC v. Ariel Capital Advisors LLC*,
    881 F.3d 520 (7th Cir. 2018) ...............................................................................11

*Asahi Metal Indus. Co. v. Superior Court of California*,
    480 U.S. 102 (1987)...........................................................................1, 10, 13, 15

*Ball v. Metallurgie Hoboken-Over-Pet, S.A.*,
    902 F.2d 194 (2d Cir. 1990).................................................................................11

*Bensusan Restaurant Corp. v. King*,
    126 F.3d 25 (2d Cir. 1997)...................................................................................14

*Best Van Lines v. Walker*,
    490 F.3d 239 (2d Cir. 2007).................................................................................13

*Blakeman v. The Walt Disney Co.*,
    613 F.Supp.2d 288 (E.D.N.Y. 2009) ...................................................................14

*Bowman v. Winder*,
    No. 14 CV 3428 (AT), 2015 WL 1639255 (S.D.N.Y. Mar. 25, 2015)..................13

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
    973 F.2d 1033 (2d Cir. 1992)..............................................................................22

*Calder v. Jones*,
    465 U.S. 783 (1984)............................................................................................15

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
    70 F.3d 267 (2d Cir. 1995)..................................................................................18

*CRT Capital Group v. SLS Capital*,
    63 F.Supp.3d 367, 375 (S.D.N.Y. 2014)............................................................16

*Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*,
    125 F.3d 28 (2d Cir. 1997)..................................................................................18

*Daimler AG v. Bauman*,
    571 U.S. 117, 134 S. Ct. 746 (2014)....................................................1, 10, 11-12

*Deere & Co. v. MTD Prods., Inc.*,
  41 F.3d 39 (2d Cir. 1994) ...............................................................................25

*Dessert Beauty, Inc. v. Fox*,
  568 F.Supp.2d 416 (S.D.N.Y. 2008)........................................................17, 18

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984)................................................................................ 10-11

*Hutchinson v. Essence Communications, Inc.*,
  769 F.Supp. 541 (S.D.N.Y. 1991).....................................................................2

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)............................................................................10

*Inc. Pub. Corp. v. Manhattan Magazine, Inc.*,
  616 F.Supp. 370 (S.D.N.Y. 1985)...................................................................22

*Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*,
  326 U.S. 310 (1945)..................................................................................10, 15

*International Information Systems Sec. Certification Consortium, Inc. v. Security University, LLC*,
  823 F.3d 153 (2d Cir. 2016)......................................................................19,20

*King Cnty. v. IKB Deutsche Industriebank AG*,
  769 F.Supp.2d 309 (S.D.N.Y. 2011)...............................................................10

*KP Permanent Make-Up, Inc. v. Lasting Impression 1, Inc.*,
  543 U.S. 111 (2004)............................................................................... 4, 18-19

*Kramer v. Vogl*,
  17 N.Y.2d 27 (1966) .......................................................................................14

*M. Shanken Commc'ns, Inc. v. Variant Events, LLC*,
  10-cv-4747 (CM), 2010 WL 4159476 (S.D.N.Y. Oct. 7, 2010).....................10, 13

*Malletier v. Dooney & Bourke, Inc.*,
  561 F.Supp.2d 368 (S.D.N.Y. 2008)...............................................................22

*Marie v. Altshuler*,
  30 A.D.3d 271 (N.Y. Sup. Ct, App. Div. 2006) ..............................................13

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997).....................................................................................2, 16

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)........................................................................10, 15

*NBA Properties v. Untertainment Records LLC*,
    1990 WL 335147 (S.D.N.Y. May 26, 1999) ........................................................25

*Norex Petroleum Ltd. v. Blavatnik*,
    22 N.Y.S.3d 138, 48 Misc.3d 1226(A) (N.Y. Sup. Ct. Aug. 25, 2015)....................12

*North Am. Soccer League v. United States Soccer Fed'n*,
    883 F.3d 32 (2d Cir. 2018)......................................................................................12

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
    590 F.Supp.2d 500 (S.D.N.Y. 2008).......................................................................22

*Pfizer v. Sachs*,
    652 F.Supp.2d 512 (S.D.N.Y. 2009).......................................................................25

*Pincione v. D'Alfonso*,
    506 Fed. Appx. 22 (2d Cir. 2012) ..........................................................................14

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)........................................................................ *passim*

*Rogers v. Ecolor Studio*,
    No 11-CV4493 (ARR), 2013 WL 752256 (E.D.N.Y. Feb. 7, 2013)......................14

*Star Industries, Inc. v. Bacardi & Co. Ltd.*,
    412 F.3d 373 (2d Cir. 2005)....................................................................................24

*Sussman v. Crawford*,
    488 F.3d 136 (2d Cir. 2007)...............................................................................2, 16

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010)......................................................................................24

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
    221 F.Supp.2d 410 (S.D.N.Y. 2002).......................................................................17

*Walden v. Fiore*,
    571 U.S. 277, 134 S. Ct. 1115 (2014).....................................................................15

**Statutes**

15 U.S.C. § 1051 *et seq*........................................................................................................4

15 U.S.C. § 1115(b) ..............................................................................................2, 12, 19, 29

15 U.S.C. § 1125(c) ...........................................................................................................27

**Rules**

CPLR § 302...........................................................................................................12,13, 14

F.R.C.P. 65(c) .................................................................................................................29

**Other Authorities**

U.S. Const. Amend. V ......................................................................................................9

U.S. Const. Amend. XIV .................................................................................................9

STX Productions, LLC, STX Financing, LLC and STX Filmworks, Inc. (collectively, "STX" or "Defendants") respectfully submit this memorandum of law, and the supporting Declarations of Adam Fogelson dated May 27, 2018 ("Fogelson Decl."), Robert Mark Springer, dated May 26, 2018 ("Springer Decl."), Keri Lynn Moore, dated May 27, 2018 ("Moore Decl."), David Halberstadter, dated May 27, 2018 ("Halberstadter Decl."), and Noah Fogelson, dated May 27, 2018 ("N. Fogelson Decl.") in opposition to the Application for Temporary Restraining Order and Preliminary Injunction (the "Application") of plaintiff Sesame Workshop ("Plaintiff" or "Sesame Workshop").

## INTRODUCTION

The Application should be denied—or deferred for further consideration on a more complete record—for the following reasons:

*First*, Plaintiff has not met its burden to establish personal jurisdiction over STX in this forum. The Due Process Clause of the U.S. Constitution precludes courts in one state from asserting personal jurisdiction over parties of another state absent a record establishing that the out-of-state defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum … thus invoking the benefits and protections of its laws." *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 109 (1987). Plaintiff's conclusory assertion that STX "regularly conducts business in New York" (Cmplt. ¶ 9) does not satisfy these jurisdictional requirements, and instead invokes outdated "doing business" jurisdictional standards rendered obsolete by the U.S. Supreme Court's ruling in *Daimler v. Bauman*, 571 U.S. 117 (2014). Plaintiff offers this Court no basis to conclude that STX "purposefully availed" itself of New York's laws or "purposefully directed" activities at its citizens. STX's nationwide marketing campaign was initiated from California, where STX maintains its principal place of business, and STX distributed

the subject material to nearly **twice** as many theaters in California as theaters in New York (and nearly **20 times** as many theaters nationwide).  Absent a showing that STX intentionally targeted New York or its residents through its actions, or "purposefully availed" itself of the benefits of New York law, Plaintiff has not met its jurisdictional burden.

*Second*, Plaintiff has not made the "clear showing" required to invoke this Court's power to obtain injunctive relief.  A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original).  Plaintiff has not clearly shown that STX used its "SESAME STREET" trademark—let alone that STX did so in a trademark sense—and any such usage was protected in any event under "fair use" provisions of the Lanham Act, 15 U.S.C. § 1051 *et seq*.

*Third*, Plaintiff has also not clearly shown it would be irreparably harmed in the absence of injunctive relief, or a balance of hardships tipping decidedly in its favor.  The anecdotal evidence offered in Plaintiff's papers does not remotely establish confusion or, more importantly, confusion flowing from the allegedly offending use of the non-trademark phrase "NO SESAME. ALL STREET.", which—by its plain terms—*distinguishes* Plaintiff's mark (a distinction that is inherently and patently obvious in any event).  Plaintiff faces heightened burdens on this Application because the remedy sought on Plaintiff's Day One application would grant it substantially all the relief sought in this lawsuit and would disturb the *status quo ante* by forcing STX to expend nearly $1.5 million to recall and replace previously-distributed film trailers, while simultaneously interrupting the integrity and consistency (at great cost and lost profits) of the carefully-planned domestic and international marketing campaign for a multi-million dollar

feature film that will open less than three months from now. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) ("Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits") (internal quotation omitted); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir. 1985) (heightened standard applied if injunction provides "substantially all the relief that is sought"). For these reasons, Plaintiff cannot make the "clear showing" that it is likely to succeed on the merits of its claim and that the balance of hardships weighs decidedly in its favor, and this Court should not invoke the "drastic remedy" of injunctive relief.

## PRELIMINARY STATEMENT

The Application asks this Court to order STX to affirmatively remove the phrase "NO SESAME. ALL STREET." (the "Tagline") from all of STX's marketing materials, including a promotional trailer (the "Trailer") and associated posters and other printed material which has already been distributed to over 5,100 theaters nationwide, for its motion picture "*The Happytime Murders*" (the "Film"), which is scheduled for release in August 2018. The Application may best be summed up as "NO FACTS. ALL ARGUMENT."

Plaintiff offers *no evidence* that potential consumers of the Film are likely to be confused and mistakenly believe that Plaintiff is the source of—or somehow affiliated with—the Film. *First*, it is readily apparent that the Tagline is not even Plaintiff's protected "SESAME STREET" mark. *Second*, to the extent that the Tagline makes use of the elements of the "SESAME STREET" mark, it is not a "trademark use" at all—but rather, as a way to *distinguish* the Film from Plaintiff's content. The Tagline is effectively a disclaimer that the Film is *not* a Sesame Workshop production. Whether considered a descriptive fair use under the Lanham Act or as a "nominative

3

fair use" under Second Circuit law, it is an entirely permissible use, even if it is possible that some consumers might be confused. The U.S. Supreme Court has made clear that "some possibility of consumer confusion must be compatible with fair use, and so it is." *KP Permanent Make-Up, Inc. v. Lasting Impression 1, Inc.*, 543 U.S. 111, 121-122 (2004).

But Plaintiff has not made a "clear showing" that the Tagline has caused, or is likely to cause, confusion, as would be required (among other things) to obtain the "drastic" relief sought on the Application. There is simply no ambiguity whatsoever in the phrase "NO SESAME" that would lead consumers to believe that STX really meant "YES SESAME" or "FROM SESAME." The very language used expressly disclaims—albeit in a clever and pithy way—any association between Plaintiff and its children-focused content and STX's R-rated, adult-oriented theatrical motion picture. And even if some number of consumers arguably were, or could be, confused about an association between Plaintiff and the Film, Plaintiff has not demonstrated—and cannot demonstrate—that such confusion was caused *specifically* by the Tagline, rather than the fact that (i) the Film was directed by Brian Henson, son of the legendary Jim Henson and director of numerous motion pictures starring famous "*Muppets*" characters; and (ii) the puppets in the Film and its marketing materials (including the Trailer) clearly and permissibly have the look and feel of Henson-created puppets.

The Application relies almost exclusively upon purported evidence of actual consumer confusion that Plaintiff claims to have unearthed on the Internet, consisting of fewer than 10 "official" website reviews of the Trailer and Internet user postings to various social media websites (*e.g.*, Facebook and Twitter). Even if these scattered Internet postings showed actual confusion due to use of the Tagline as opposed to non-protected attributes of the Trailer (they do not), they are quantitatively inconsequential, given the ***millions*** of Internet users who have viewed the Trailer

online, and the **tens of thousands** of Internet users who have reacted to and/or commented on the Trailer on social media websites.[1]  Plaintiff undoubtedly pored over the many posted comments and culled from that universe the nine comments that purportedly support the Application. Presumably, these comments were the most helpful postings Plaintiff could find.

And yet, a review of those nine Internet postings evidences virtually no confusion whatsoever about the source and sponsorship of the Film.  None of the postings manifests a mistaken belief that Plaintiff is somehow responsible for the Film or its Trailer; and more critically, none of the postings manifests confusion *as a result of the use of the Tagline*.

Likewise, Plaintiff offers no evidence that its brand has been diluted in any way by the use of the Tagline in STX's promotional materials for the Film.  Plaintiff argues at great length that the Tagline "appalled viewers because of what they believe to be a serious breach of trust by Sesame in supporting this movie;" and that Plaintiff's brand has been tarnished because the Tagline is used "in the context of sexual activity, profanity, and illegal activity."  Memorandum in Support of Application ("Pl. Mem.") at 2, 25.  But Plaintiff offers no evidence that any dilution has actually occurred.

The Application is also bereft of an evidentiary showing of any injury at all, much less irreparable and incalculable injury.  Plaintiff offers only the bare-bones and conclusory argument

---

[1]     The Film's official Facebook page reflects that, as of last Friday, there had been 2.6 million views of the Trailer; 42,000 "reactions" (i.e., "emojis that allow users to react to posts); more than 51,000 "shares" of the Trailer; and nearly 12,000 comments.  The Film's official Twitter page reflects that the Trailer has had over 2.4 million views on this site; 555 comments, 2,600 "retweets;" and 7,200 "likes." AMC Theatre's Facebook page, where the Trailer also can be viewed, reflects that there had been more than 2.6 million views of the Trailer; more than 32,000 reactions; more than 13,000 comments; and 65,000 shares, many of which offer glowing praise to the Trailer, and essentially none of which evidence confusion, let alone confusion engendered by the Tagline.  *See* Halberstadter Decl., ¶ 4 at Exhs. 1, 2.  As discussed in the balance of hardship section, the Film's marketing campaign turns in large part on the viewing history described herein, and would be largely lost if the Application were granted and STX forced to revise the Trailer to excise the Tagline.  *See infra* at 28-29; Moore Decl., ¶¶ 21-24.

that "the violent and obscene nature of the Trailer alone is already impugning Sesame's decades-earned goodwill." (Pl. Mem. at 27.)  By contrast, STX demonstrates in this Opposition that it will incur substantial, calculable damage—totaling nearly $1.5 million in immediate hard costs, plus additional losses from the disruption of its carefully-planned domestic and international marketing campaign for the Film—if it is required to withdraw its promotional materials from the marketplace, edit the Trailer and other materials to remove the Tagline, and then re-introduce these promotional materials back into the marketplace.[2]

But it is not merely the cost of taking these steps that will harm STX; even more critically, the loss of marketing time and the destruction of STX's organic, "viral" social media strategy will be devastating to the success of the Film itself, resulting in incalculable injury.  Plaintiff blithely suggests that an order granting the Application would impose "trivial" costs on STX (Pl. Mem. at 30); the record (*infra* at 27-29) abundantly shows otherwise.  For these reasons and others discussed below, STX respectfully urges this Court to deny the Application.

## **FACTUAL BACKGROUND**

From the very inception of STX's development of the Film, the creative executives responsible for "greenlighting" the project envisioned the Film as a "pulling back of the curtain" on the very adult lives of the puppets that "live" in the universe of The Jim Henson Company ("Henson Company").  The Film was not conceived as just a raunchy version of the Henson Company puppet family, but rather, as a never-before-seen glimpse into their private lives, when children are not around.  (Fogelson Decl., ¶¶ 4-8.)  Henson Company principal Brian Henson ("Brian"), the director of the Film, shared STX's view of the Film.  (*Id.*)  In fact, Henson Company

---

[2]     Specific steps that would have to be undertaken and estimated costs associated therewith are set forth in the accompanying declarations.  *See* Springer Decl. at ¶¶ 10-14; Moore Decl. at ¶¶ 12-20.

had previously delved into the "adult" side of its kid-friendly puppets with a pilot episode for *The Muppet Show* titled *The Muppet Show: Sex and Violence*. (*Id.*)

There was never any intention to use or copy existing puppets from either *Sesame Street* or *The Muppets*, but rather, to create entirely new puppets that would clearly reflect by their look, feel and mannerisms that they came from the world of Henson Company and its large family of puppets. (*Id.* at ¶ 8.)

When it came to devising the marketing strategy for the Film, Brian and Henson Company were consulted at every stage. They reviewed and commented on various versions of the promotional trailer; and they expressed their views about the Tagline. Far from being upset about the Tagline, disagreeing with its use, or taking "a hard position" against its use, as the Application claims, Brian actually thought the Tagline was funny and fine to use. He was more concerned with certain technical aspects of the Trailer, such as its "color saturation," than the use of the Tagline. (*Id.* at ¶¶ 9-11.)

STX formally launched its marketing campaign for the Film at "CinemaCon," the annual convention of The National Association of Theater Owners, on April 24, 2018 in Las Vegas. CinemaCon is considered to be the largest and most important gathering for the worldwide motion picture industry, and it is where the major motion picture studios debut their upcoming slates of theatrical films to theater owners and the media. (Moore Decl., ¶¶ 4-5.) STX showed footage of the film for the first time at CinemaCon, which was similar to the final promotional trailer and which included the Tagline. (*Id.* at ¶¶ 6-7.) The attending media reported on this "sneak peek," and a number of them reported on the Tagline specifically. (*Id.* at ¶ 8 and Exh. 1.) STX then used the overwhelmingly positive reaction from the press to begin the "consumer-facing" launch of the Film's marketing campaign. (*Id.*)

The promotional trailer for the Film was launched in theaters during the nationwide premiere of the R-rated motion picture *Deadpool 2* on the evening of May 17, 2018. (*Id.* at ¶ 8.) By then, the Trailer had been distributed to more than 5,000 theaters nationwide, to be shown in conjunction with that film, whose target audience is the same as the target audience for the Film. (Springer Decl., ¶¶ 4-8.) STX had also shipped more than 9,500 movie posters (referred to as "one-sheets") to approximately 3,000 theaters nationwide. (Springer Decl., ¶ 9.)

Concurrently with the initial release of the Trailer in theaters, STX launched a comprehensive "digital marketing" campaign on the Internet, particularly on social media websites like Facebook and Twitter. This digital campaign included an initial "tease" about the upcoming online availability of the Trailer, the online launch of the Trailer itself, and the uploading of various other promotional materials. (Moore Decl., ¶¶ 9-10.)

The Trailer describes the Film almost exactly as both STX and Brian had envisioned the Film. The Trailer also prominently identifies the sources of the Film as STX Films, "H.Brothers" (the logo for Huayi Brothers Media Corp., a Chinese multinational entertainment company), and Black Bear Pictures. (Halberstadter Decl., ¶¶ 5-8.) These source identifiers appear in the Trailer *before* the Tagline, which itself expressly *disclaims* any sponsorship of or connection to the Film by Sesame Workshop. Interspersed between scenes from the Film, the Trailer includes a series of narrative, descriptive statements that, when read consecutively, provide the following description:

After 35 Years of Entertaining Children, The Director of The Muppet Christmas Carol, The Director of Muppet Treasure Island, The Director of Muppets Tonight, Is Finally Ready To Reveal What Goes Down When Kids Aren't Around. This Summer, No Sesame, All Street. Justice Isn't Always Warm and Fuzzy. Melissa McCarthy. The Happytime Murders. Coming Soon.

(*Id*.)

Late in the afternoon on Friday, May 18, 2018, STX received a cease and desist letter from Plaintiff demanding—among other things—that by midnight on the same day, STX remove the Trailer from theaters, Facebook, YouTube, and everywhere else that it can be viewed. On Monday, May 21, 2018, STX (through counsel) responded to, and respectfully declined to comply with, Plaintiff's demands. This lawsuit was commenced, and the *ex parte* Application was filed, on Thursday, May 24, 2018.

## **ARGUMENT**[3]

**I.** **Plaintiff Has Not Demonstrated Personal Jurisdiction In This Court Because There Is No Showing That STX Purposely Availed Itself of the Privilege of Conducting Activities In New York State, Thereby Invoking The Benefits And Protections of New York Law.**

Personal jurisdiction issues raise questions of constitutional significance under the Due Process Clause. *See* U.S. Const. Amend. V, XIV. These concerns are particularly profound in the procedural context raised by this Application, where Plaintiff filed an *ex parte* request for a temporary restraining order (with 12 hours of notice) requiring STX to defend itself at a location nearly 3,000 miles away from its home forum, and seeking Day One injunctive relief that would grant essentially all the relief sought in this suit. This Court declined to grant the relief sought by Plaintiff at the initial May 24, 2018 argument on the Application, expressly noting its concern that

---

[3] Subject to the Court's approval, the parties have agreed that STX may submit a 30-page opposition brief (matching the length of Plaintiff's opening brief), and that Plaintiff may submit a 12-page reply brief.

a ruling lacking proper foundational jurisdictional basis would raise difficult legal and practical issues as this lawsuit moves past its embryonic stages.

The concerns noted by the Court on May 24, 2018 remain true today. It is well-settled that Plaintiff bears the burden of establishing jurisdiction over each defendant. *King Cnty. v. IKB Deutsche Industriebank AG*, 769 F.Supp.2d 309, 313 (S.D.N.Y. 2011). "[C]onclusory non-fact-specific jurisdictional allegations," such as those asserted by Plaintiff here, "will not establish personal jurisdiction." *Id.* at 316, n.28; *M. Shanken Commc'ns, Inc. v. Variant Events, LLC*, 10-cv-4747 (CM), 2010 WL 4159476, at *3 (S.D.N.Y. Oct. 7, 2010). The Application must be denied unless Plaintiff establishes that STX has minimum contacts with the forum such that each "defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum … thus invoking the benefits and protections of its laws." *Asahi Metal Indus., supra,* 480 U.S. at 109. The Court must also deny the Application unless the "assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, [it must be] reasonable under the circumstances of the particular case." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (*quoting Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

Courts distinguish between "general" and "specific" personal jurisdiction in assessing whether an entity has requisite "minimum contacts" with the forum state. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). General jurisdiction permits courts to hear "any and all claims" against an entity. *Daimler*, 571 U.S. at 122. Specific jurisdiction, by contrast, permits courts to exercise jurisdiction only over issues "arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

The Lanham Act does not authorize nationwide service of process. *Ariel Investments, LLC v. Ariel Capital Advisors LLC*, 881 F.3d 520, 521 (7th Cir. 2018) (reversing district court and dismissing trademark claim for lack of personal jurisdiction); *Alibaba Group Holding Limited v. Alibabacoin Foundation*, 18-CV-2897 (JPO), 2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018) (declining to enter preliminary injunction in trademark case absent showing of personal jurisdiction). Accordingly, personal jurisdiction in this action is determined—subject to constitutional limitations—in accordance with the law of the state where the court sits. *Ball v. Metallurgie Hoboken-Over-Pet, S.A.*, 902 F.2d 194, 198 (2d Cir. 1990).

As shown below, Plaintiff has not met its burden to establish personal jurisdiction as it has not clearly shown that STX purposefully availed itself of the benefits and protections of New York law, or that the assertion of personal jurisdiction in New York is otherwise fair.

A.   The Court Lacks General Personal Jurisdiction.

The U.S. Supreme Court's landmark decision in *Daimler* held that long-standing "doing business" tests that formerly allowed the exercise of personal jurisdiction were "unacceptably grasping," and instead premised invocation of general jurisdiction on a corporation's in-state place of incorporation and principal place of business. *Daimler*, 571 U.S. at 138.   STX is not subject to the exercise of general jurisdiction under these new and stricter post-*Daimler* standards, as it maintains neither its place of incorporation nor its principal place of business in New York.

The Complaint alleges STX "regularly conducts business in New York, including by promoting, marketing, and advertising[] films here." Cmplt. ¶ 9.  Such activities do not establish "affiliations with the State so constant and pervasive as to render [STX] essentially at home in the forum State." *Daimler*, 571 U.S. at 127.  The "doing business" theory of jurisdiction posited by Plaintiff as a basis for asserting general personal jurisdiction is outdated and obsolete in post-

*Daimler* jurisprudence. *Norex Petroleum Ltd. v. Blavatnik*, 22 N.Y.S.3d 138, 48 Misc.3d 1226(A), at *20 (N.Y. Sup. Ct. 2015) (*Daimler* "brought an end to 'doing business' jurisdiction"). Accordingly, STX is not subject to general jurisdiction in New York.

      B.  <u>The Court Lacks Specific Personal Jurisdiction.</u>

Plaintiff has also failed to show that STX is subject to specific jurisdiction. In assessing whether a non-domiciliary like STX is subject to specific jurisdiction in New York, a court must first determine whether the long-arm statute confers jurisdiction, and then determine whether the exercise of jurisdiction comports with due process. *Alibaba*, *supra*, 2018 WL 2022626 at *3. Plaintiff has not met its burden for either prong of this test.

      1.  <u>Plaintiff Has Not Demonstrated Compliance With New York's Long-Arm Statute.</u>

New York's long-arm statute provides that a court may exercise personal jurisdiction for claims arising from: (1) business that a defendant "transacts . . . within the state" or (2) "a tortious act" committed "within the state." CPLR 302(a)(1)-(2).[4] Plaintiff generically claims jurisdiction under these two state law provisions because "[Defendants] have specifically targeted their products and services to consumers in New York and committed a tortious act within the state." <u>Cmplt.</u> ¶ 11; *see also* <u>Pl. Mem.</u> at 14.

These conclusory assertions do not clearly establish personal jurisdiction. Plaintiff's unsworn assertion that STX conducted business "specifically targeted" towards New York is rebutted by the record, which conclusively establishes that STX did ***not*** "specifically target" its relevant business to New York, but instead embarked on a ***nationwide*** marketing campaign that

---

[4]    Plaintiff invokes only these provisions and does not seek to premise jurisdiction upon CPLR § 302(a)(3) which allows the assertion of personal jurisdiction, subject to constitutional limits, for "a tortious act" committed "without the state causing injury to person or property within the state." *See* <u>Cmplt.</u> ¶ 11.

disproportionately directed the Trailer to locations outside of New York. *See* <u>Springer Decl.</u>, ¶ 8 (STX distributed the Trailer to 5,122 theaters nationwide). In fact, STX directed nearly ***twice as many*** Trailers to theaters in California as New York. *Id.* Similarly, Plaintiff offers no allegations whatsoever that STX purposefully availed itself of the benefits and protections of New York law. *Asahi Metal Indus., supra,* 480 U.S. at 109. To the extent that Plaintiff alleges that the mere act of distributing the Trailer from California for viewing in New York meets both the statutory and constitutional prerequisites for the establishment of personal jurisdiction, the case law provides otherwise. *See, e.g., M. Shanken*, *supra*, 2010 WL 4159476, at *3 (dismissing trademark claims on personal jurisdiction grounds) ("mere solicitation of business within the state does not constitute the transaction of business within the state"); *see also Marie v. Altshuler*, 30 A.D.3d 271, 272 (N.Y. Sup. Ct, App. Div. 2006) (affirming dismissal of suit for lack of long-arm jurisdiction where allegedly tortious acts occurred out-of-state; "situs of the injury for long-arm [jurisdiction] purposes is where the event giving rise to the injury occurred, not where the resultant damages occurred").[5]

Plaintiff's claim that STX is subject to specific jurisdiction based on a tortious act committed within New York, pursuant to CPLR 302(a)(2), also fails. The Court of Appeals has long given "restrictive meaning to the requirement that there be a showing of a tortious act committed in th[e] State[,]" and required evidence of actual in-state conduct. *Kramer* v. *Vogl*, 17 N.Y.2d 27, 31 (1966) (declining to find long-arm jurisdiction under CPLR § 302(a)(2), court notes:

---

[5]    This is also true with regard to the Trailer's presence on the Internet. *See Best Van Lines v. Walker*, 490 F.3d 239 (2d Cir. 2007) (affirming dismissal of defamation claim against Iowa-based Internet speaker under CPLR § 302(a)(1) for lack of personal jurisdiction); *Bowman v. Winder*, No. 14 CV 3428 (AT), 2015 WL 1639255 at *2 (S.D.N.Y. Mar. 25, 2015) (dismissing copyright infringement claim for lack of personal jurisdiction absent evidence that alleged infringer "explicitly targeted New York in any way").

"in common sense and reality, everything [Defendant] did was done in Europe.")  Similarly, this circuit has previously held CPLR § 302(a)(2) to apply only when a defendant is physically present within the state.  In *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 28-29 (2d Cir. 1997), the Second Circuit refused to find long-arm jurisdiction under CPLR § 302(a)(2) and dismissed a trademark infringement action against a Missouri business.  The Court wrote, in language directly applicable here:

> The acts giving rise to Bensusan's lawsuit—including the authorization and creation of King's web site, the use of the words "Blue Note" and the Blue Note logo on the site, and the creation of a hyperlink to Bensusan's web site—were performed by persons physically present in Missouri and not in New York.  Even if Bensusan suffered injury in New York, that does not establish a tortious act in the state of New York within the meaning of § 302(a)(2)).

*See Bensusan, supra,* 126 F.3d at 29; *see also Pincione v. D'Alfonso*, 506 Fed. Appx. 22 (2d Cir. 2012) (following *Bensusan*).  Plaintiff concedes that STX is located in Delaware and California, Cmplt. ¶ 6-8, and provides no facts alleging that STX sent employees or agents to New York. *See* Cmplt. ¶ 6-9; Pl. Mem. at 14.

Neither of the cases cited by Plaintiff warrants a different conclusion.  *Rogers v. Ecolor Studio*, No 11-CV4493 (ARR), 2013 WL 752256 (E.D.N.Y. Feb. 7, 2013) involved a damages inquest after an out-of-state defendant defaulted.  The Magistrate Judge conducting that non-adversarial proceeding found personal jurisdiction for plaintiff's copyright infringement based upon CPLR § 302(a)(3)(ii), a portion of the New York long-arm statute that Plaintiff did not even invoke here.  *Blakeman v. The Walt Disney Co.*, 613 F.Supp.2d 288 (E.D.N.Y. 2009) merely declined to grant a Rule 12(b)(2) under the standards governing such motions where plaintiff alleged that the "creation, production, and distribution" of allegedly infringing copyright material occurred in New York.  *Id.* at 302.  Plaintiff here makes no comparable allegations, and the record establishes that STX did not conduct any business in connection with the creation or distribution

of the promotional trailer for the motion picture *The Happytime Murders* in or from the State of New York. (<u>N. Fogelson Decl.</u> at ¶¶ 3-5).

2. <u>Plaintiff Has Not Demonstrated Compliance With Constitutional Due Process Requirements.</u>

Even if Plaintiff could meet the statutory standards for assertion of long-arm jurisdiction, it has not shown that the exercise of personal jurisdiction would meet constitutional due process requirements, which require "defendant's suit-related conduct" to "create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. --, 134 S. Ct. 1115, 1121 (2014). It is the defendant's actions—not the plaintiff's domicile—that creates necessary contacts to establish jurisdiction. "Mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 1118 (citing *Calder v. Jones*, 465 U.S. 783, 788-89 (1984)).

More broadly, the constitutional issues at stake on the Application raise immediate concerns, as Plaintiff seeks immediate and mandatory injunctive relief in a distant forum without alleging with requisite specificity any jurisdiction-creating acts in which STX allegedly engaged. At its core, the assertion of personal jurisdiction must comport with "'traditional notions of fair play and substantial justice'—that is, [it must be] reasonable under the circumstances of the particular case." *Metro. Life Ins., supra*, 84 F.3d at 568 (*quoting Int'l Shoe Co.*, 326 U.S. at 316 (1945)). Plaintiff has not established that STX "purposefully avail[ed] itself of the privilege of conducting activities" within New York "thus invoking the benefits and protections of its laws." *Asahi Metal Indus., supra,* 480 U.S. at 109. The court has already correctly noted the profound consequences of considering the merits of injunctive relief until threshold jurisdictional issues are resolved. Fairness requires that the Application be denied until that occurs.

**II. The Application Must Be Denied Because Plaintiff Has Failed To Satisfy Any Of The Evidentiary and Legal Requirements For Injunctive Relief.**

A. Overview Of TRO And Preliminary Injunction Standards

To obtain a TRO, Plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *CRT Capital Group v. SLS Capital*, 63 F.Supp.3d 367, 375 (S.D.N.Y. 2014) (citations omitted). A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman, supra,* 488 F.3d at 139 (*quoting Mazurek, supra*) (emphasis in original). Moreover, because Plaintiff seeks an injunction that will alter, rather than maintain, the *status quo*, it must make a heightening showing of success on the merits, demonstrating a "clear" or "substantial" likelihood of success. *N. Am. Soccer League*, *supra*, 883 F.3d at 32. This heightened showing is also required as injunctive relief would provide "substantially all the relief" sought in this suit. *Abdul Wali, supra*, 754 F.2d at 1026.

B. Plaintiff Cannot Demonstrate A Likelihood Of Prevailing On Its Trademark Claims Because STX Did Not Use The "SESAME STREET" Mark At All, Much Less Make A "Trademark Use" Of That Mark.

Before this Court begins to apply the *Polaroid* factors in order to determine whether there is any appreciable likelihood of consumer confusion that will result from STX's use of the Tagline, the Court should first consider whether Plaintiff's mark is used at all. The Tagline is not "SESAME STREET." It does not use the "SESAME STREET" distinctive font or the "street sign" in connection with which the mark is consistently depicted:



Obviously, both the words "Sesame" and "Street" appear in the Tagline, though not contiguously. But this does not necessarily constitute a use of the mark itself.

Even if the Court concludes that the Tagline does, in fact, make some use of the "SESAME STREET" mark, it should not begin to apply the *Polaroid* factors before determining whether the use in the Tagline is actually a "trademark use." A "trademark use" occurs when a mark indicates the source or origin of consumer products. *Dessert Beauty, Inc. v. Fox*, 568 F.Supp.2d 416, 423-424 (S.D.N.Y. 2008). Conversely, a *non-trademark* use occurs when the trademark *is not* being used to indicate the source or origin of consumer products, such as (but not only) when it is being used to comment upon and, in the case of parody, to ridicule, the trademark owner. *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 414 (S.D.N.Y. 2002).

Whatever use the Tagline makes of the "SESAME STREET" mark, the mark very clearly is not being used to identify Plaintiff as the source of the Film. Quite the contrary, it is being used to *differentiate* the Film from the content produced by Sesame Workshop—"NO SESAME"—and to *disclaim* any affiliation or association between the Film and *Sesame Street* productions. The Tagline accomplishes this in a pithy, concise and clever way that at the same time subtly pokes a little fun at *Sesame Street*.

In fact, the Trailer overtly and prominently identifies the companies that *are* the source of the Film, *before* the Tagline ever appears. On separate "cards," the Trailer identifies STX, then H.Brothers, and then Black Bear Pictures. (Halberstadter Decl., ¶¶ 5-8.) So if the Court were to conclude that the Tagline does not make use of the "SESAME STREET" mark, or that it only

makes a non-trademark use of the mark, the Court should deny the Application without ever evaluating the *Polaroid* factors.

    C. <u>Plaintiff Cannot Demonstrate A Likelihood Of Prevailing On Its Trademark Claims Because Any Use Of Its Mark Was Permissible As Either A Descriptive Or Nominative Fair Use.</u>

Not only is the Tagline's arguable use of the "SESAME STREET" mark a non-trademark use; it is also a permissible fair use that constitutes a complete defense to Plaintiff's claims. This arguable use qualifies both as a descriptive fair use under 15 U.S.C. § 1115(b)(4) and as a "nominative fair use" under Second Circuit judicial decisions.

    1. <u>Descriptive Fair Use</u>

The Second Circuit has expressly recognized that Section 1115(b)(4) of the Lanham Act "permits others to use a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995); *see also Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) ("Fair use is a defense to liability under the Lanham Act even if a defendant's conduct would otherwise constitute infringement of another's trademark. . . . The defense permits others to use protected marks in descriptive ways, but not as marks identifying their own products."); *Dessert Beauty, Inc. v. Fox*, 568 F.Supp.2d 416, 423 (S.D.N.Y. 2008) ("The fair use doctrine permits the use of protected marks to describe certain aspects of goods, but not as marks to identify the goods. Even if a party's conduct would otherwise constitute infringement of another's trademark, fair use provides an absolute defense to liability.")

Importantly, a defendant who relies on fair use as a defense to trademark infringement is not required to negate any likelihood of confusion. The U.S. Supreme Court made this clear in *KP Permanent Make-Up, Inc. v. Lasting Impression 1, Inc.*, 543 U.S. 111, 114 (2004) ("question

here is whether a party raising the statutory affirmative defense of fair use to a claim of trademark infringement . . . has a burden to negate any likelihood that the practice complained of will confuse consumers about the origin of the goods or services affected. We hold it does not.")  Just as importantly, the Court observed:  "Since the burden of proving likelihood of confusion rests with the plaintiff, and the fair use defendant has no free-standing need to show confusion unlikely, it follows . . . that some possibility of consumer confusion must be compatible with fair use, and so it is."  *Id.* at 122.

   2. Nominative Fair Use

   In *International Information Systems Sec. Certification Consortium, Inc. v. Security University, LLC*, 823 F.3d 153 (2d Cir. 2016), the Second Circuit formally adopted the nominative fair use doctrine as a test that should be followed, in addition to applying the *Polaroid* factors, in cases involving nominative use; *i.e.* where the defendant used the plaintiff's mark to describe *plaintiff's* goods or services.  The Second Circuit saw no reason to replace the *Polaroid* test in the context of a nominative use, but expressly recognized that many of the *Polaroid* factors are "a bad fit" in cases of nominative use.  *Id.* at 167.  Because the *Polaroid* factors are non-exclusive, and because the Second Circuit believed "that the nominative fair use factors will be helpful to a district court's analysis," it held in *International Information Systems* that in nominative use cases, district courts are to consider the Ninth Circuit and Third Circuit's nominative fair use factors, in addition to the *Polaroid* factors:

> When considering a likelihood of confusion in nominative fair use cases, in addition to discussing each of the *Polaroid* factors, courts are to consider: (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is,

whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*Id.* at 167-168.

Whether the Tagline's use of the words "Sesame" and "Street" is viewed (i) as descriptive of the Film (literally describing what it *is not*) but not as a mark to identify the Film, or (ii) as a nominative use (to describe *Plaintiff's* products), it is a prototypically fair use that constitutes a complete defense to Plaintiff's claims.

D. <u>Plaintiff Cannot Demonstrate A Likelihood of Consumer Confusion Resulting Specifically from STX's Use Of The Tagline.</u>

Turning to application of the *Polaroid* factors, the only factor that Plaintiff can satisfy is the first factor, the strength of its mark. STX does not contest that the "SESAME STREET" mark is a strong one. Certain of the other *Polaroid* factors are simply "a bad fit" because any use of the "SESAME STREET" mark in the Trailer is a nominative use. Finally, not only cannot Plaintiff satisfy the remaining *Polaroid* factors, but the evidence demonstrates that those factors are in STX's favor.

1. <u>Similarity Between Marks</u>

This factor prototypically represents the "bad fit" with nominative uses to which the Second Circuit referred in *International Information Systems*. STX uses the Tagline to *distinguish* between Plaintiff's entertainment content and its own, and to cleverly *disclaim* any association, endorsement or sponsorship by Plaintiff of the Film. So the Tagline has to evoke *Sesame Street* in some way. It is also important to note that the Trailer prominently identifies the source of the Film as STX, H.Brothers and Black Bear Pictures, *before* the Tagline appears. (<u>Halberstadter</u>

Decl., ¶ 7.)  Because any use by STX of the "SESAME STREET" mark would be a nominative use, this *Polaroid* factor should not be considered at all. [6]

## 2.  Proximity of Products in Marketplace

Plaintiff makes a desperate effort to claim that it has satisfied this factor.  It notes that for this factor, courts consider the likelihood that a plaintiff in the near future might begin selling products similar to those of the defendant.  (Pl. Mem. at 19-20.)  But Plaintiff offers no evidence that it is likely in the future to offer adult-oriented content similar to the Film.  So the fact remains that there is no proximity in the marketplace between Plaintiff's educational programming for young children and STX's very adult-oriented motion picture.  The fact that both are "forms of filmed entertainment" and "depict puppets and people co-existing in a fictional urban setting" is both utterly generic and entirely irrelevant.

## 3.  Actual Confusion

It is remarkable that Plaintiff places so much emphasis on its purported satisfaction of this factor, despite the fact that it has offered no evidence that *any* consumers are actually confused about an affiliation or connection between Plaintiff and the Film, much less that an appreciable number of consumers are actually confused *specifically because of the Tagline.*  One has only to read the nine supposed examples of actual confusion that Plaintiff offered with its Application to conclude that none of the authors of those social media posts and Internet reviews is confused in the least, and certainly not confused because of the Tagline.

---

[6]     Plaintiff argues that the addition of "NO" to "SESAME" and "ALL" to "STREET" increases confusion, leading consumers to believe that *The Happytime Murders* "is an adult version of *Sesame Street*."  (Pl. Mem. at 18-19.)  But it offers no *evidence* of this assertion.  Plaintiff also absurdly argues that "young children who watch *Sesame Street* will likely not draw or understand a distinction between SESAME STREET and "NO SESAME.  ALL STREET."  (*Id.*)  Of course young children should not be watching the Trailer, as access to it is restricted online and children should not be in the theater watching a trailer before an R-rated film.

During the initial hearing on the Application, Plaintiff represented to the Court that nine instances of actual confusion was "highly unusual" in trademark cases. While a plaintiff need not show actual confusion in order to satisfy the *Polaroid* test, to satisfy the actual confusion factor, the evidence of such confusion has to be meaningful, substantial, or appreciable, and not *de minimis*. *See, e.g., Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) ("plaintiff's mark is a strong one and the similarity between the two names is great, but the evidence of actual confusion, when analyzed, is not impressive"); *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 387-388 (2d Cir. 2005) (the appellant's evidence of actual confusion was extremely weak, "while appellees' evidence, though not flawless, tended to prove that actual confusion was minimal at worst and nonexistent at best); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1045 (2d Cir. 1992) ("Bristol has not demonstrated any meaningful instances of actual confusion resulting from the 'Tylenol PM' trade dress").[7]

Plaintiff's nine examples of supposed actual confusion must be considered in the context of the total number of Internet users who have viewed the Trailer, commented on it in some form, and shared it with others. Even if one considered only the number of comments that have been posted about the Trailer, Plaintiff's nine examples are utterly inconsequential. As is demonstrated in the Halberstadter Declaration, there have been at least 2.6 million views of the Trailer on the official Facebook page for the Film alone. On that social media website, there have also been

---

[7]    *See also O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F.Supp.2d 500, 523 (S.D.N.Y. 2008) ("De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion."); *Malletier v. Dooney & Bourke, Inc.*, 561 F.Supp.2d 368, 387 (S.D.N.Y. 2008) ("Because so little of Louis Vuitton's evidence indicates any confusion as to source, sponsorship, or affiliation between the products of plaintiff and defendant, no reasonable juror could find that actual confusion exists. This factor, therefore, weighs in defendant's favor."); *Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541, 554 (S.D.N.Y. 1991) ("While no evidence of actual confusion is required in order to prove a likelihood of confusion . . . , the trial judge may properly infer from the absence of actual confusion that no likelihood of confusion exists."); *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386 (S.D.N.Y. 1985) ("isolated instances of actual confusion may be disregarded as *de minimis*").

more than 51,000 "shares" of the Trailer by Facebook users, at least 42,000 "reactions" to the Trailer (users can select an "emoji" to express their feelings for the content) and nearly 12,000 comments about it. On the official Twitter page for the Film, there have been at least 2.4 million views of the Trailer; at least 2,600 "retweets" of the Trailer; and at least 555 comments on it. There have been many views and comments about the Trailer on other websites, as well. (Halberstadter Decl. ¶ 4, Exh. 2.)

Viewed in the context of the total number of user comments that have been made to date about the Trailer, Plaintiff's nine examples, even if they evidenced actual confusion arising from the use of the Tagline—which they do not—could not be considered more than *de minimis*.

4. Bad Faith

Plaintiff argues that STX's purported bad faith "is evidenced by their deliberate reference to *Sesame Street* in their marketing materials." (Pl. Mem. at 22.) If Plaintiff were correct about the law, then a trademark plaintiff would never have to offer evidence of bad faith because the mere reference to its mark presumptively would constitute bad faith. Plaintiff cannot point to any conduct or statements by STX, other than the fact that the Tagline appears in the Trailer, as evidence of STX's bad faith. By contrast, the Chairman of STX Films, Adam Fogelson, has testified that when STX came up with the Tagline, it believed that it was a humorous, pithy way of letting viewers know that the Film *was not* a *Sesame Street* production; that it was, in fact, very different than a *Sesame Street* production; and that the Tagline would succinctly and cleverly *distinguish* the Film from *Sesame Street* productions. It did not occur to STX that a viewer would see and hear "NO SESAME" and think "YES SESAME." (Fogelson Decl., ¶ 11.)

5. <u>Quality of STX's Product and Consumer Sophistication</u>

Whether the Film appeals to an individual's personal tastes or not, there can be little question that STX's motion pictures generally, and the Film in particular, are of high quality. The Film will be a wide summer release, featuring famous actors and high production values. Moreover, this is one of those *Polaroid* factors that does not truly apply where, as here, the arguable use of Plaintiff's mark is to reference Plaintiff's own content, not the Film.

With regard to the consumer sophistication factor, Plaintiff lamely argues that "both *Sesame Street* and *The Happytime Murders* are targeted to general consumers," as if that is even true, much less demonstrative of low consumer sophistication. *Sesame Street* is targeted to young children, and perhaps to parents looking for educational content for their young children. The Film is targeted to consumers of R-rated, adult-themed entertainment content. This group may well include parents, but if parents lack the sophistication to distinguish between an R-rated film suitable for their own viewing and G-rated educational content for their children, we are all in trouble.

E. <u>Plaintiff Cannot Demonstrate That Its Mark Has Been Diluted, Tarnished Or Blurred In Any Way Specifically By STX's Use Of The Tagline.</u>

Federal law allows the owner of a "famous mark" to enjoin a person from using "a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." 15 U.S.C. § 1125(c)(1). "Dilution by blurring" is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110-111 (2d Cir. 2010); 15 U.S.C. § 1125(c)(2)(B). "Dilution by tarnishment" is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110-111 (2d Cir. 2010); 15 U.S.C. §

1125(c)(2)(C). "This 'generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product.'" *Id.* (*quoting Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)).

Plaintiff has made no evidentiary showing that either tarnishment or blurring has occurred because of STX's use of the Tagline. It argues that its mark is being portrayed in an unwholesome and unsavory context, but the fact is that the context in which the mark is being portrayed (if it is being portrayed at all) is one in which Plaintiff's wholesome content is being distinguished from and disassociated from the Film.

These circumstances are materially different from those in *Pfizer v. Sachs*, 652 F.Supp.2d 512 (S.D.N.Y. 2009) or *NBA Properties v. Untertainment Records LLC*, 1999 WL 335147 (S.D.N.Y. May 26, 1999), upon which Plaintiff relies. In *Pfizer*, the defendant, as a way of advertising its unique form of advertising, informed Pfizer that it planned to tow a decommissioned Air Force missile bearing the Viagra brand into Manhattan and park it in front of Pfizer's headquarters, where it would be "ridden" by two female models distributing condoms. The district court found that this type of activity would likely harm Pfizer's reputation and tarnish its Viagra mark. In *NBA Props.*, the defendant published an advertisement in which the NBA's logo of a silhouetted basketball player dribbling a basketball had been altered to put a handgun in one hand, in conjunction with the promotion of a new rap album, entitled "SPORTS, DRUGS, & ENTERTAINMENT." The district court concluded that the NBA "is bound to suffer negative associations" from the advertisement.

Blurring requires there to be similarities between two *marks*; *i.e.*, the plaintiff's famous mark and the defendant's mark or trade name. But STX is not using the Tagline as a mark or trade

name.  It is describing the characteristics of the Film in reference to *Sesame Street*, using its own STX mark as the source-identifier of the Film.  In addition, Plaintiff has offered no evidence that STX's use of the Tagline has impaired in any manner the distinctiveness of its mark.  Based on the foregoing, Plaintiff has failed to demonstrate that the Tagline dilutes its "SESAME STREET" mark in any appreciable way.[8]

F.  <u>Plaintiff Cannot Demonstrate That It Has Sustained Any Injury Whatsoever, Much Less Irreparable And Incalculable Injury, As A Result Of STX's Use Of The Tagline.</u>

To the extent that proof of irreparable injury to Plaintiff is an important factor in evaluating the Application, Plaintiff offers none.  Plaintiff argues stridently that "the violent and obscene nature of *the Trailer alone* is already impugning Sesame's decades-earned goodwill and reputation."  (<u>Pl. Mem.</u> at 27.)  But it offers no evidence that this is so.

G.  <u>Plaintiff Also Has Failed To Demonstrate Either That There Are Serious Questions Going To The Merits Of Its Claims Or That The Balance Of Hardships Tips Decidedly In Its Favor.</u>

As an alternative to the "likelihood of success" showing required for preliminary injunctive relief, a moving party may instead seek to establish that there exist sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the moving party's favor.  *N. Am. Soccer League*, *supra*, 883 F.3d at 37.  Plaintiff fails to meet its burden on these requirements, as well.

---

[8]     Similarly, Plaintiff cites *Marshak* v. *Sheppard,* 666 F. Supp. 590 (S.D.N.Y. 1987) for the proposition that "the addition of a qualifying term to a trademark, rather than eliminating confusion, tends to cause confusion."  <u>Pl. Mem.</u> at 18.  Plaintiff conveniently omits that in *Marshak*, the "qualifying term" modified "The Drifters" to "Rick Sheppard and The Drifters."  Neither this decision, nor the other decisions cited in *Marshak*, addressed the significance of a qualifying term like "no" or "not."  *E.g., A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir.1972) ("La Crosse by Bradley" versus "Cross" for pens); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970) ("Cuti-Trim" vs. "Trim").  This and the remainder of the trademark analysis herein applies equally to Plaintiff's state law claims, which likewise do not warrant the "drastic" remedy of injunctive relief.

There are no serious questions going to the merits in this case. STX has used the words "Sesame" and "Street" in a tagline that is designed to differentiate the Film from *Sesame Street*. This non-trademark use is a fair use, and an absolute defense to Plaintiff's claims. Plaintiff has offered no evidence of the likelihood of consumer confusion, no evidence of actual confusion, no evidence of dilution and no evidence of injury.

Based on the evidence submitted in support of and in opposition to the Application, Plaintiff has woefully failed to demonstrate that the balance of hardships tips in its favor *at all*, much less decidedly so. The Application is bereft of any evidence of hardship at all, relying exclusively on theoretical *arguments* about the risk that the public will associate the Film with Plaintiff. By comparison, STX has offered significant, substantial evidence of the actual, quantifiable financial harm that granting the Application would cause, coupled with the incalculable damage to the success of the Film that would result. (*See* Section III below.) In short, the balance of hardships tips decidedly in STX's favor, and it is not a close call.

## III. STX Will Incur Substantial Costs And Damage If It Is Required To Remove The Tagline From Its Promotional Materials For The Film.

The Springer and Moore Declarations evidence just how expensive it would be—in actual, "real dollars" costs—for STX to remove all the Trailer and posters from the 5,000-plus theaters that have already received these materials; to compensate for the lost views of the Trailer by audience members who otherwise would have seen it in theater; to revise and/or create a new trailer without the Tagline, and new posters and other printed materials without the Tagline; and to revise STX's digital marketing strategy, which includes and leverages the online viewing to date of the Trailer and other promotional materials.

In his declaration, Mr. Springer, the Senior Vice President, Distribution & Worldwide Operations for STX, explains that one of the most important tools the marketers of movies have at

their disposal is the film trailer. As other motion picture studios do, STX looks at the calendar of upcoming films to determine "targets" for its trailers, based on a number of criteria including rating, genre, thematic elements, and target audience. (Springer Decl., ¶¶ 4-7.)

STX distributed the Trailer for the Film to 5,122 theaters nationwide, which represents more than 87% of all first-run theaters in the United States. In addition, STX shipped to over 3,000 exhibitors movie posters for the Film. (*Id.* at ¶¶ 8-9.) If STX were required to remove/recall the Trailers and movie posters from all of these theaters, and replace them with new promotional materials, STX would incur approximately $350,500 in "hard costs." (*Id.* at ¶¶ 9-13.)

But the far greater damage to STX, and for which it would incur very substantial costs to compensate for, would be the loss of "impressions"—*i.e.*, individual consumer views of the Trailer—that would result if the Trailer could not continue to be shown in conjunction with the exhibition of the motion picture *Deadpool 2*, whose target market is the same as the target market for the Film. In order to compensate as best as it could for the loss of these impressions, STX would be required to purchase from theatrical exhibitors a comparable number of impressions via "trailer buys." Based on STX's experience in making "trailer buys" in connection with the marketing of other films, STX estimates that it would cost approximately $715,000 to purchase the number of "impressions" that STX would lose by not having the Trailer shown in conjunction with the exhibition of *Deadpool 2.* (*Id.* at ¶ 14.)

And there is more: In her declaration, Ms. Moore, STX's Executive Vice President, Creative Advertising and Brand Strategy, testifies that the cost to redesign and revise the Trailer would cost approximately $270,000, the cost to revise the Film's poster and other print media would cost approximately $100,000, and the cost to revise the digital strategy for the Film would cost approximately $50,000. (Moore Decl., ¶¶ 12-19.) Accordingly, if STX were required to

recall and replace its current Film trailer and printed promotional materials with new versions that omit the Tagline, and to re-design its digital/social media marketing campaign, STX estimates that it will incur approximately $1,485,500 in "hard costs."

But that covers only the calculable, out-of-pocket expenditures that STX would incur. It would also suffer massive, incalculable damage to the potential performance of the Film. The Film's trailer has already been distributed to more than 5,000 theaters nationwide, as well as to theaters in foreign countries, including the United Kingdom, France, Ukraine, Russia, Belgium, Netherlands, Finland, South Africa and Malaysia. If STX were required to retrieve the Trailer before a new trailer could be created and distributed, there would be a not-insignificant period of time during which theaters in the U.S. and internationally would have *no* trailer for the Film, and STX could lose weeks, if not more, of in-theater marketing. (Fogelson Decl., ¶ 14.)

Likewise, the Trailer is currently receiving millions of views on social media platforms such as Facebook and Twitter. If the Trailer must be removed before a replacement is available, the Film will lose critical visibility on the Internet, and all of the "viral" sharing of the Trailer between and among social media users will disappear (because there will be no trailer to be viewed at the URL "link" that Internet users shared with each other). (Moore Decl., ¶¶ 22-23.) For a motion picture to really succeed these days, it must maintain a public "buzz" from the very start of the marketing campaign to (and beyond) the film's theatrical premiere. "Pulling" the Trailer and other promotional materials that are already in the marketplace (in both the real world and online) could devastate the Film. (Fogelson Decl. at ¶ 15.)

In sum, while Plaintiff has offered no more than the hypothetical and factually unsupported *possibility* of some injury if the Application is denied, STX has offered *substantial evidence* of the calculable and incalculable damage it would suffer if the Application were granted.

**IV.**    **If The Court Believes That Injunctive Relief Is Warranted, It Should Condition Such Relief On Plaintiff's Posting Of A Substantial Bond, Sufficient To Cover STX's Demonstrated Costs And Damage.**

The posting of security is appropriate in trademark disputes to secure a temporary restraining order.  *See* F.R.C.P. 65(c). Plaintiffs request a nominal bond, claiming (without evidence) that the costs incurred by STX from the TRO would be "trivial."  However, as shown above, the costs and damages are significant.  Furthermore, the court may and should consider summer movie season when determining the proper valuation of the bond.

## CONCLUSION

For all of the reasons explained above, and based upon the evidence submitted with this Opposition, STX respectfully urges that the Application should be denied.

Dated: New York, New York
         May 28, 2018

Respectfully Submitted.

By: /s/ David L. Goldberg
       David L. Goldberg
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
Phone: 212-940-6787
Email:  david.goldberg@kattenlaw.com

By: /s/ David Halberstadter
       David Halberstadter
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Phone: 310-788-4400
Email: david.halberstadter@kattenlaw.com

*Attorneys for Defendants*